CLERKS OFFICE US DISTRICT COURT
AT ABINGDON, VA
FILED
August 27, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Robin Bordwine
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **MARTY GILBERT,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 1:25cv00055 |
| | ) | **<u>REPORT AND</u>** |
| **FRANK BISIGNANO,** | ) | **<u>RECOMMENDATION</u>** |
| **Commissioner of** | ) | |
| **Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Marty Gilbert, ("Gilbert"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Gilbert protectively filed applications for DIB and SSI on November 13, 2021, alleging disability as of October 28, 2019, based on a stroke, nerves, anxiety, back problems, depression, "disc in neck" and headaches. (R. at 248, 251-59, 286.) The claims were denied initially and upon reconsideration. (R. at 159-68, 170-76.) Gilbert then requested a hearing before an administrative law judge, ("ALJ"), which was held on March 19, 2024, at which he was represented by counsel. (R. at 53-88, 177.) At the hearing, Gilbert amended the alleged onset date to October 28, 2021. (R. at 58.)

By decision dated April 1, 2024, the ALJ denied Gilbert's claims. (R. at 32-48.) The ALJ found Gilbert met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2024. (R. at 34.) The ALJ found Gilbert had not engaged in substantial gainful activity since October 28, 2021,[1] the amended alleged onset date. (R. at 34.) The ALJ determined that Gilbert had severe impairments, namely, residual effects of stroke; functional neurological symptom disorder; right hemiparesis; seizure disorder; migraine/cluster headache disorder; degenerative disc disease; anxiety disorder; and depressive disorder, but he found Gilbert did not have an impairment or combination of impairments that met or

[1] Therefore, Gilbert must show he was disabled between October 28, 2021, the amended alleged onset date, and April 1, 2024, the date of the ALJ's decision, to be eligible for DIB benefits. For SSI purposes, the relevant time period for determining disability is November 13, 2021, the protective filing date, through the date of the ALJ's decision.

medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 35-38.)

The ALJ found that Gilbert had the residual functional capacity to perform light[2] work, except he could not climb ladders, ropes and scaffolds; he could occasionally balance, stoop, crouch, crawl and climb ramps and stairs; he could frequently handle and finger with the right upper extremity; he should avoid concentrated exposure to extreme cold; he could not work around hazards, such as exposed high places or unprotected moving mechanical parts; he could understand, remember and carry out simple instructions; he could occasionally interact with co-workers, but could not perform group or tandem tasks; he could have no interaction with the public; he could use judgment to make simple, work-related decisions; he could deal with occasional changes in a routine work setting; and he could not perform work requiring a specific production rate such as assembly line work or work requiring hourly quotas. (R. at 39.) The ALJ found Gilbert could not perform his past relevant work as a tractor trailer truck driver. (R. at 46-47.) Based on Gilbert's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Gilbert could perform, including the jobs of a sorter, a routing clerk and an office helper. (R. at 47-48.) Thus, the ALJ concluded that Gilbert was not under a disability as defined by the Act from the alleged onset date of October 28, 2021, through the date of the decision, and he was not eligible for DIB or SSI benefits. (R. at 48.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2025).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2025).

After the ALJ issued his decision, Gilbert pursued his administrative appeals, (R. at 246-47), but the Appeals Council denied his request for review. (R. at 15-19.) Gilbert then filed this action seeking review of the ALJ's unfavorable decision, which stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2025). This case is before this court on Gilbert's brief, filed December 10, 2025, the Commissioner's brief, filed January 8, 2026, and Gilbert's reply brief, filed January 22, 2026.

## *II. Facts*

Gilbert was born in 1974, (R. at 251, 253), which, at the time of the ALJ's decision, classified him as a "younger person" age 45-49 under 20 C.F.R. §§ 404.1563(c), 416.963(c). He graduated from high school and obtained a welding certificate and a commercial driver's license, ("CDL"). (R. at 60-61, 63.) He has past work experience as a tractor trailer truck driver. (R. at 47.) Gilbert testified he lived with his elderly parents. (R. at 62.) He said he did not have any responsibilities around the house because he was not reliable and would either forget the task or leave a stove burner or faucet on. (R. at 62.) He said he no longer had a driver's license because it was suspended. (R. at 62-63.) Gilbert said he liked to hunt and fish, which he could no longer do. (R. at 63.) He said he previously worked as a coal hauler. (R. at 63-64.) Gilbert said he had a stroke on October 28, 2021, which caused him to have mental health and strength problems. (R. at 65-66.) Gilbert said he was unable to do anything by himself after the stroke, and he had not been anywhere by himself in the last year. (R. at 66.) He said he was frequently agitated. (R. at 66-67.) Gilbert said, because of his stroke, when he was nervous, confused or frustrated, his speech would start to slur. (R. at 68.) He said because of the stroke, he developed cluster headaches, which lasted several days, and during which he had to lie in a dark

bedroom. (R. at 69-71.) Gilbert said he struggled to use his right hand and arm due to right-sided weakness from the stroke. (R. at 71-72.) He endorsed a history of opiate and methamphetamine use, but said he had not used either drug in over a year, and, when he was using them, they did not cause agitation or problems with memory. (R. at 74.)

Tania Shullo, ("Shullo"), a vocational expert, ("VE"), also was present and testified at Gilbert's hearing. (R. at 78-86.) She testified that a hypothetical individual of Gilbert's age, education and work experience, who could perform light work, but who could not climb ladders, ropes or scaffolds; who could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; who could frequently handle and finger with the right upper extremity; who should avoid concentrated exposure to extreme cold; who should have no exposure to hazards, such as exposed moving mechanical parts or unprotected heights; who could understand, remember and carry out simple instructions; who could occasionally interact with co-workers, but who could not perform group or tandem tasks or have any interaction with the public; who could use judgments to make simple work-related decisions; and who could deal with occasional changes in a routine work setting, could not perform Gilbert's past relevant work. (R. at 79.) She testified that work existed in the national economy that the hypothetical individual could perform, namely, the jobs of a sorter, a routing clerk and an office helper. (R. at 79-80.) She testified that the same individual, but who was limited to sedentary[3] work, could perform the jobs of a sorter, a lens inserter and an addresser. (R. at 80.) Shullo

[3] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2025).

testified that, in the unskilled occupational base, employers typically tolerate no more than 14 percent off-task behavior, and 15 percent or more was work-preclusive. (R. at 81.) Shullo testified that a hypothetical individual, who was limited to sedentary work and could not frequently use the right hand to grip, to finger, to grasp, to handle and to lift, would be unable to work at the sedentary level. (R. at 81.) She testified that an individual who could not learn his job duties within a 30-day introductory period would be unable to work. (R. at 83.)

In rendering his decision, the ALJ reviewed records from Stephen Saxby, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Jack Hutcheson, Jr., M.D., a state agency physician; Russell County Medical Center; Redbud Family Medicine; Clinch Valley Medical Center; Dr. Nasreen Dar, M.D.; Vickie Stevens, F.N.P.; Mountain States Medical Group Neurology; Johnston Memorial Hospital; Merit Medical Group; Ballad Health Neurology; and Ballad Health Medical Associates.

On September 23, 2021, Gilbert saw his primary care provider, Dr. Muhammad Javed, M.D., at Merit Medical Group, where he reported feeling very nervous. (R. at 484.) He had a poor appetite and complained of lower back pain that worsened if he bent over or sat too long. (R. at 484.) During physical examination, Gilbert had tenderness over the lumbar spine. (R. at 484.) Gilbert denied any headaches or depressive symptoms. (R. at 484.) Nonetheless, Dr. Javed diagnosed major depression. (R. at 484.) Dr. Javed prescribed buspirone and noted that Gilbert was prescribed oxycodone and methadone by another provider. (R. at 485.)

On October 25, 2021, Gilbert saw Dr. Javed at Clinch Valley Medical Center, with complaints of slurred speech and weakness in the right upper and lower

extremities for about four days. (R. at 409.) He was dragging his right leg when walking and could not hold objects with his right hand. (R. at 409.) He was admitted to the hospital for suspicion of a stroke, and he was discharged on October 27, 2021, with diagnoses of features of acute stroke, generalized anxiety disorder and degenerative disc disease and bulging disc at the L4-L5 and L5-S1 levels resulting in mild foraminal stenosis. (R. at 411.) During physical examination, Gilbert had tenderness of the lumbar spine; he was nervous and apprehensive, but not in acute distress; he had weakness of the right upper extremity and right lower extremity; the deep power in the right hand was reduced; and he walked with a limp. (R. at 415.) While he was hospitalized, magnetic resonance imaging, ("MRI"), studies were completed, which showed no acute or subacute abnormality of the brain, but mild bilateral foraminal stenosis at the L4-L4 and L5-S1 levels, secondary to disc desiccation and broad-based bulge. (R. at 411.) At discharge, Gilbert had some slurred speech and residual weakness in the right upper and lower extremities, but his condition was improved and stable. (R. at 411.)

On October 28, 2021, Gilbert presented to the emergency department at Bristol Regional Medical Center with altered mental status. (R. at 542.) He was anxious and agitated, and a urine drug screen was positive for cannabinoids, oxycodone and amphetamines. (R. at 542, 563.) Psychiatry was consulted and diagnosed anxiety, depression and polysubstance abuse and recommended Paxil and melatonin with outpatient mental health follow up. (R. at 542.) During his psychiatry consultation, Gilbert reported a headache that had lasted for two days, but he denied unilateral numbness or weakness; he was fully oriented, but anxious and frustrated at the care he received during his hospitalization; he reported anxiety that was nine out of 10 in severity; he endorsed depression and feelings of helplessness, hopelessness, worthlessness and uselessness; he denied suicidal or homicidal

ideation and hallucinations; he reported poor sleep and a poor appetite with 70 pounds of weight loss over the previous year; he denied illicit drug use. (R. at 546.) Chest x-rays and a CT scan of the brain were normal. (R. at 543-44.) During physical examination, Gilbert had mildly diminished air entry, some agitation and rapid, stuttering speech. (R. at 544, 561.) However, Gilbert left the hospital against medical advice before prescriptions could be given. (R. at 542.)

On November 11, 2021, Gilbert saw Dr. Javed with complaints of neck pain and recurrent headache. (R. at 482.) He reported feeling very nervous and depressed, but he said he could not take buspirone because it made him feel funny. (R. at 482.) The weakness in his right arm and leg was much improved. (R. at 482.) He had some slurring of speech and appeared depressed and nervous. (R. at 482.) Dr. Javed prescribed Klonopin and Imitrex. (R. at 483.)

On November 29, 2021, Gilbert saw Dr. Nasreen Dar, M.D., a psychiatrist, for a psychological evaluation at the request of Disability Determination Services. (R. at 439-41.) Gilbert reported back pain for several years, but he denied a specific back injury. (R. at 439.) He said the pain radiated down to his left leg and caused numbness and weakness, resulting in occasional falls. (R. at 439.) He said he had difficulty sitting, standing or walking for too long. (R. at 439.) After the stroke, he reported numbness and weakness in his right arm and difficulty speaking and expressing his thoughts. (R. at 439.) He reported requiring assistance with personal care and treating at a pain management clinic. (R. at 439.) Gilbert said he had been anxious for a long time, but his emotional difficulties were exacerbated since his stroke. (R. at 439.) He could not tolerate crowds, loud noises or children, and he preferred to be alone. (R. at 439.) He said he had difficulty going to sleep and was restless during the night. (R. at 439.) He had a reduced appetite and had been losing

weight, and he felt hopeless, helpless and worthless, but he denied suicidal thoughts or attempts. (R. 439.) When he was upset or nervous, he developed a headache and had difficulty concentrating. (R. at 439.) He currently took Klonopin for his mental health. (R. at 439.) Gilbert reported graduating from high school and said he received a welding certificate. (R. 439.) He had previous work as a carpenter and drove a tractor trailer, but he had not worked since October 2019. (R. at 439.) Gilbert reported spending his day watching television. (R. at 440.) He said he did not help with household chores or leave the house to shop. (R. at 440.) He reported smoking cigarettes and marijuana. (R. at 440.) During mental status examination, Gilbert arrived promptly; he was cooperative for the interview; his affect and mood were anxious and depressed; he was neatly and casually dressed; he was not fully oriented; he had difficulty relating information to the examiner; his speech was slurred and stuttering; there was no evidence of circumstantial or tangential thinking; his concentration was somewhat impaired; he was not able to name five recent past presidents of the United States; his intellect appeared to be deteriorated; he counted by threes up to 30 on his fingers, but he had difficulty doing any serial seven subtractions; he was unable to do a simulated purchase or change for one dollar; his recent and remote memory was partially limited; his impersonal judgment was impaired; he was unable to give any response to a proverb; he was unable to abstract any similarity between the telephone and pencil; his general fund of knowledge was fair; he had a fair amount of insight into his difficulties, but a low amount of self-esteem; he did not appear to have any hallucinations; and he was not delusional. (R. at 440.) Dr. Dar assessed severe neurotic depression, chronic generalized anxiety disorder and a history of right-sided stroke and degenerative disc disease. (R. at 440.) She listed Gilbert's prognosis as poor. (R. at 440.) She found that Gilbert continued to have physical problems and emotional difficulties which limited his daily activities and interactions; and he could not tolerate stress and had difficulty

concentrating. (R. at 441.) Dr. Dar opined that Gilbert was unable to obtain gainful employment and was not a good candidate for vocational rehabilitation; she recommended he seek psychiatric follow-up treatment; and, if any funds were granted, he would need assistance handling the funds. (R. at 441.)

On December 6, 2021, Gilbert saw Dr. Javed for a refill of his psychiatric medication. (R. at 480.) He had increased strength in his right arm and leg, and his speech was improved, but he felt nervous at all times. (R. at 480.) He denied any headaches, any pain or stiffness in his neck or depressive symptoms. (R. at 480.) On January 4, 2022, Gilbert saw Dr. Javed for a refill of his medications. (R. at 501.) He had some slurring of speech and weakness in his right arm and leg, and he limped while walking. (R. at 501.) Gilbert denied suffering any headaches, pain in his muscles or joints or any limitation in range of motion. (R. at 501.) On January 28, 2022, Gilbert again saw Dr. Javed with complaints of nervousness, and he still had some residual weakness in his right arm and leg. (R. at 499.) He denied any headaches, pain in his muscles or joints or any limitation of range of motion. (R. at 499.)

On February 8, 2022, Gilbert saw Dr. Dar for treatment of his anxiety disorder. (R. at 442.) Gilbert endorsed palpitations, chest discomfort, lightheadedness, excessive sweating, excessive worrying, sleep disturbance, poor concentration, irritability, depression symptoms, excessive crying, fatigue, weight gain, neck pain, neck stiffness, back pain, joint pain, joint stiffness and joint swelling, leg cramps and muscle cramps, among other things. (R. at 442.) He was not suicidal or homicidal. (R. at 442.) His symptoms were relieved by anxiolytics and antidepressants. (R. at 442.) During physical examination, Gilbert was wringing his hands, he was fidgety, and he had a flat affect. (R. at 443.)

On February 9, 2022, Gilbert completed a Disability Determination Services Headache/Migraine Questionnaire. (R. at 304.) Gilbert indicated he suffered from headaches/migraines at least four times a week; his headaches/migraines sometimes lasted all day; his symptoms included a dull ache and stabbing pain; his last headache/migraine was two days previously; he treated his headaches/migraines by lying in bed in a dark room with no noise; and it sometimes took him 24 hours to recover from a headache/migraine. (R. at 304.)

On February 28, 2022, Gilbert saw Dr. Javed with complaints of excessive nervousness. (R. at 497.) The weakness in his right arm and leg was slowly improving, and his speech was better. (R. at 497.) His wife reported that one day his eyelids started twitching, and he could not talk, then he was confused. (R. at 497.) Gilbert reported no headaches and no depressive symptoms. (R. at 497.) When Gilbert saw Dr. Javed on March 29, 2022, he reported episodes where his right eye twitched, and he was unable to speak. (R. at 511.) The episodes lasted a few minutes to an hour. (R. at 511.) Gilbert was nervous and still had some residual weakness in his right arm and leg. (R. at 511.) Gilbert reported no headaches. (R. at 511.) Dr. Javed added a diagnosis of seizure disorder, and he prescribed Keppra. (R. at 511-12.) On April 28, 2022, Gilbert saw Dr. Javed and reported that his seizures had improved and were less frequent since he began taking Keppra the previous month. (R. at 509.) He also reported nervousness and residual weakness in his right arm and leg. (R. at 509.) He denied any headaches, pain in his muscles or joints or limitation in range of motion. (R. at 509.)

On May 21, 2022, Gilbert saw Vickie Stevens, F.N.P.-B.C., for a physical consultative examination at the request of Disability Determination Services. (R. at

446-50.) Gilbert said, since his stroke, he had impaired memory, and his primary care provider felt he was having small seizures. (R. at 446.) His wife reported that, the previous week, he did not recognize her for about five hours, and she said Gilbert was depressed and anxious. (R. at 446.) Gilbert said he did not frequently leave the house; he had mood swings and was easily angered; his speech was fast and slurred without clonazepam; he had no balance and had fallen three times; his appetite was poor; he had back pain and neck pain; and his spouse helped him with bathing, dressing and other activities of daily living. (R. at 446.) He reported taking clonazepam, clopidogrel, levetiracetam and aspirin. (R. at 446.) He said he smoked cigarettes, but denied alcohol and illicit drug use. (R. at 446.) Gilbert endorsed fatigue, night sweats, recent weight change, change in appetite, change in vision, headache, vertigo, hoarseness, palpitations, claudication, orthopnea, pleuritic chest pain, dyspnea on exertion, wheezing, cough, change in appetite, indigestion, nausea, diarrhea, polydipsia, easy bruising, lower back pain, knee pain, shoulder pain, neck pain, seizures, weakness, tremor, sensory loss, loss of coordination, mood changes, depression, anxiety, difficulty concentrating and insomnia. (R. a 446.) During physical examination, Gilbert ambulated with assistance; his speech was limited and not always understandable; his right hand was swollen, and he could not lift his right arm; he walked with a cane; he was able to rise from a sitting position with assistance, but could not stand on tiptoes or heels; he could not tandem walk; he was unable to bend and squat; his strength was 2/5 in the right hand without adequate fine motor movements, and there was decreased dexterity and ability to grasp objects; he was fully oriented; he did not appear depressed or anxious; he was able to communicate with no deficits; his recent and remote memory were intact; and he had good insight and cognitive function. (R. at 447.) Gilbert's range of motion was impaired in his right elbow, shoulder, and wrist and in his lumbar spine. (R. at 449.) Stevens diagnosed Gilbert with status post-stroke with right-sided weakness, lower

back pain, anxiety, depression and degenerative disc disease. (R. at 448.) She opined he would be unable to sit, walk and/or stand for a full workday but could lift and carry objects with limitations. (R. at 448.) She further opined he could hold a conversation, respond appropriately to questions and carry out and remember instructions, but his speech was slurred and not easy to understand. (R. at 448.)

On May 31, 2022, Gilbert told Dr. Javed that the "episodes of being blank" were less and that the weakness in his right upper and lower extremities was improving. (R. at 507.) Gilbert reported no headaches, no pain in his muscles or joints and no limitation of range of motion. (R. at 507.)

On June 30, 2022, Gilbert saw Dr. Javed and said that his seizures had improved after taking Keppra, but he was not taking it on a regular basis and still had seizures every once in a while. (R. at 505.) He reported feeling nervous and said he had residual weakness in the right half of his body. (R. at 505.) He reported no headaches, no muscle or joint pain, no limitation of range of motion and no depressive symptoms. (R. at 505.)

On July 29, 2022, Gilbert saw Dr. Javed with complaints of nervousness. (R. at 503.) The weakness in his right arm and leg was improving, and he denied having a recent seizure. (R. at 503.) Gilbert reported no headaches, no weakness, tremor or seizures and no depressive symptoms. (R. at 503.) A random urine screen conducted at his previous visit was positive for hydrocodone, oxycodone, gabapentin, methamphetamine and amphetamine, none of which were prescribed by Dr. Javed. (R. at 503.) Gilbert admitted to taking oxycodone but no other drugs. (R. at 503.) Dr. Javed refused to refill Gilbert's Klonopin prescription and offered to prescribe another antianxiety medication, but Gilbert refused. (R. at 504.)

On September 26, 2022, Gilbert saw Rachel Anderson, N.P., a nurse practitioner at BHMA neurology, to establish care. (R. at 452.) Gilbert reported going to the hospital four to five days after his stroke symptoms began. (R. at 454.) The hospital prescribed aspirin and Plavix. (R. at 452.) He reported a history of anxiety, depression and polysubstance abuse. (R. at 452.) He reported "light seizures" characterized by twitching of his right eye that improved with Keppra. (R. at 452.) He had poor memory and was a poor historian, and he reported agitation and nervousness with crying spells. (R. at 452.) Gilbert said he did not drive after the stroke. (R. at 452.) He endorsed fatigue, visual disturbance, back pain, seizures, speech difficulty, weakness in his right hand, lightheadedness, numbness, headaches, agitation, behavioral problems and dysphoric mood. (R. at 453.) During physical examination, Gilbert had decreased strength and sensation in his right arm and hand. (R. at 455.) Anderson diagnosed acute encephalopathy, anxiety and functional neurological symptom disorder,[4] ("FND"), with weakness or paralysis. (R. at 455.) She scheduled a nerve conduction study to rule out other possible causes of right arm weakness, such as carpal tunnel. (R. at 455.) Gilbert completed the nerve conduction study on December 15, 2022, and the results were normal. (R. at 458.)

On December 28, 2022, Gilbert presented to the emergency department at Johnston Memorial Hospital with complaints of lower back pain that had progressively worsened over the previous four days. (R. at 471.) Gilbert stated the pain radiated down to his left leg and was moderate in severity. (R. at 471.) He was

[4] FND refers to a neurologic condition caused by changes in how brain networks work, rather than changes in the structure of the brain itself, as seen in many other neurological disorders. Physical symptoms of FND are genuine but cannot be explained by changes in the brain structure. The exact cause of FND is unknown. *See* https://www.ninds.nih.gov/health-information/disorders/functional-neurologic-disorder (last visited June 25, 2026).

mildly tachycardic and afebrile appearing, but physical examination was normal. (R. at 472-73, 597.) X-rays showed no acute findings or significant degenerative changes in the lumbar spine. (R. at 474.) He reported improvement after receiving medication in the emergency room and was discharged with prescriptions for Motrin, Tylenol and Flexeril. (R. at 474.)

On February 15, 2023, Gilbert saw Barbara Elam, F.N.P., a nurse practitioner, at Merit Medical Group. (R. at 517.) He requested an antibiotic for a suspected sinus infection, and he said he had a couple of seizures since his last appointment, but he did not recall how many or how severe they were. (R. at 517.) He did not want to adjust his seizure medication. (R. at 517.) He requested Klonopin, stating that it was the only medication that would manage his symptoms. (R. at 517.) Elam refused to prescribe Klonopin and recommended lab work, but Gilbert declined. (R. at 518.)

On April 12, 2023, Gilbert saw Dr. Shaena Blevins, M.D., a neurologist at Johnston Memorial Hospital for follow up. (R. at 519.) Gilbert said he still was having memory issues, but he did not want to follow up with psychiatry. (R. at 519.) He said he still was having seizures where his eye twitched, and Keppra was not helping. (R. at 519.) He wanted to be seen monthly by neurology, and he was upset that he could no longer get pain medication or Klonopin due to his positive urine drug screen. (R. at 519-20.) Neurological examination was normal. (R. at 521.) Dr. Blevins discontinued Keppra because there was no clear evidence of seizure activity, and prescribed medications for possible cluster headaches. (R. at 521.) An awake and asleep electroencephalogram, ("EEG"), performed on April 27, 2023, was normal. (R. at 525.) An MRI of the brain performed the same day showed chronic paranasal sinus disease, but was, otherwise, normal. (R. at 527.)

On June 5, 2023, Gilbert saw Elam for follow up. (R. at 534.) He reported he was now living with his parents due to a recent separation from his wife. (R. at 534.) He reported cough and congestion and requested an antibiotic. (R. at 534.) He denied any seizures since his last visit, and he requested a referral to pain management for his chronic low back pain. (R. at 534.) Elam recommended labs, including a Keppra level, but Gilbert declined. (R. at 535.) She referred Gilbert to pain management. (R. at 535.)

On August 19, 2023, Gilbert went to the emergency department at Bristol Regional Medical center for lumbar back pain. (R. at 600.) He indicated he had been off his pain medication for approximately one month, but he did have a scheduled follow up with his pain management provider. (R. at 600.) He said the pain worsened that morning and radiated to his left leg and testicle. (R. at 600.) During physical examination, he had a normal musculoskeletal range of motion, negative straight leg raise test, normal patellar and Achilles reflexes, and tenderness to the lower back. (R. at 601-02.) A CT scan of the lumbar spine showed mild multi-level lower lumbar facet joint degeneration. (R. at 605.) Gilbert was diagnosed with mild lumbar back pain with radiculopathy, and he was prescribed pain medication and steroids. (R. at 603.) On August 29, 2023, Gilbert again presented to the emergency department with complaints of altered mental status and stroke-like symptoms. (R. at 611.) He was alert and oriented, but hyperactive and intermittently confused. (R. at 611.) He reported stress and financial difficulties, and he had left his parents' home three days previously and had not been seen since that time. (R. at 611.) He could not remember what he was doing or where he had been. (R. at 611.) He denied a current or past history of illicit drug or alcohol use. (R. at 611.) During physical examination, he appeared chronically ill; he was inattentive; his mood was anxious, and his affect was inappropriate; his speech was rapid, pressured and tangential; he was

hyperactive; his cognition and memory were impaired; and his judgment was impulsive. (R. at 613-14.) Gilbert exhibited no musculoskeletal tenderness or deformity, and range of motion was normal. (R. at 613.) A CT angiogram of the neck showed mild to moderate bony degenerative changes in the cervical spine and an MRI of the brain was normal. (R. at 617-18, 625.) A urine drug screen was positive for marijuana metabolites and amphetamines. (R. at 628-29.) He remained in the hospital for two days, and he was prescribed lorazepam and gabapentin upon discharge. (R. at 609.)

On November 2, 2023, Gilbert saw Kristie J. Nies, Ph.D., for a neuropsychological assessment pursuant to a referral from Dr. Blevins. (R. at 536-40.) During the examination, Gilbert's motor activity was within normal limits; his receptive language for conversation appeared intact; he did not appear to have difficulty understanding or retaining test direction; his conversational speech was characterized by a word finding problem at times; he mumbled and was easily agitated; his mood was anxious and dysphoric; he was tearful at times; he was pleasant and cooperative throughout the interview but was unable to tolerate testing; he reported a headache and was fearful of it increasing in intensity; he did not understand the nature of the evaluation; he acknowledged forgetting names and conversations, misplacing items, inattentiveness and having trouble finding words. (R. at 537.) He said he did not manage money, did not drive, did "hardly nothing" on a typical day and forgot to take his medication. (R. at 537.) He reported multiple head injuries with loss of consciousness and that his most significant injury occurred one year previously when he was assaulted with an ashtray. (R. at 537.) He denied current illicit drug use, but said he had recently been discharged from a drug rehabilitation facility for opiate addiction and currently went to a methadone clinic. (R. at 537.) At the time of the evaluation, he said he had a headache that was a five

on a 10-point scale. (R. at 537.) Gilbert endorsed a persistent, sad mood; sleep disturbance; decreased appetite with weight loss; decreased interest and pleasure in activities; feelings of worthlessness and guilt; fatigue; past suicidal ideation; excess worry; restlessness; irritability; muscle tension; and panic attacks. (R. at 537.) In summary of the evaluation, Nies stated:

> …Gilbert's testing was discontinued due to agitation, inattention, mood disturbance, and physical discomfort. Also, there was indication of insufficient/inconsistent task engagement. He has multiple risk factors for cognitive dysfunction; however, his cognitive abilities cannot be accurately assessed at this time.

(R. at 536.) Nies diagnosed memory loss by report; and major depressive disorder with anxious distress. (R. at 536.) Gilbert was encouraged to obtain a primary care provider. (R. at 536.)

Dr. Jack Hutcheson, Jr., M.D., a state agency physician, completed a physical residual functional capacity assessment of Gilbert on June 1, 2022, in connection with the initial determination of Gilbert's claims. (R. at 111-13.) Dr. Hutcheson found Gilbert could occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds. (R. at 111-12.) He found Gilbert could stand and/or walk for two hours in an eight-hour workday and sit for six hours in an eight-hour workday. (R. at 112.) Dr. Hutcheson found Gilbert could occasionally climb ramps and stairs, balance, stoop, kneel and crouch. (R. at 112.) He found Gilbert could never climb ladders, ropes or scaffolds and never crawl. (R. at 112.) Dr. Hutcheson found Gilbert could frequently handle and finger with the right hand and should avoid concentrated exposure to extreme cold and all exposure to hazards such as machinery and heights. (R. at 112-13.) He noted these restrictions were due to Gilbert's degenerative disc disease of the thoracic, cervical and lumbar spine,

arthritis of the left knee and history of stroke, but Dr. Hutcheson noted Gilbert's condition was expected to improve within 12 months from the date of his stroke. (R. at 113.)

Dr. Bert Spetzler, M.D., another state agency physician, completed a physical residual functional capacity assessment of Gilbert in connection with the reconsideration of his claims on December 16, 2022. (R. at 136-38.) Dr. Spetzler opined Gilbert could occasionally lift and carry 20 pounds and frequently lift and carry less than 10 pounds. (R. at 136.) He found Gilbert could stand and/or walk for a total of six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. (R. at 137.) He found Gilbert could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but he could never climb ladders, ropes and scaffolds. (R. at 137.) He found Gilbert was limited in handling and fingering with his right hand and should avoid concentrated exposure to extreme cold and hazards. (R. at 137-38.)

Joseph Leizer, Ph.D., a state agency psychologist, completed a mental residual functional capacity assessment of Gilbert on June 1, 2022, in connection with the initial determination of his claims. (R. at 113-15.) He found Gilbert was moderately limited in his ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (R. at 114-15.) He noted that Gilbert had no difficulty getting along with others, but he did not like being around a lot of noise, he angered easily and he had bad mood swings.

(R. at 114.) He noted that Gilbert could communicate without deficits, but he had limited speech and sometimes was difficult to understand. (R. at 114.) Thus, Leizer opined Gilbert could perform simple, unskilled tasks with infrequent public interaction. (R. at 115.) Also on June 1, 2022, Leizer completed a Psychiatric Review Technique Form, ("PRTF"), finding Gilbert was moderately limited in his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 109.)

Stephen Saxby, Ph.D., another state agency psychologist, completed a mental residual functional capacity assessment of Gilbert on December 16, 2022, in connection with the reconsideration of his claims. (R. at 138-40.) Saxby opined Gilbert was moderately limited in his ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (R. at 139-40.) Saxby concluded that Gilber could perform simple, unskilled tasks. (R. at 140.) Also on December 16, 2022, Saxby completed a PRTF, which mirrored that of Leizer. (R. at 134.)

## *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2025). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is

working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2025).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Gilbert argues that the ALJ's physical residual functional capacity finding is not supported by substantial evidence. (Plaintiff's Brief at 6-14.) Specifically, Gilbert argues that the ALJ erred by finding Gilbert's migraines/cluster headaches to be a severe impairment at Step 2, but failed to account for all functional limitations arising from his headaches at Step 4, such as time off task or absenteeism. (Plaintiff's Brief at 9-14.) Gilbert raises no other error with the decision.

As stated herein, the ALJ found Gilbert had the residual functional capacity to perform light work, except he could not climb ladders, ropes and scaffolds; he could occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs; he could frequently handle and finger with the right upper extremity; he should avoid concentrated exposure to extreme cold; he could not work around hazards, such as exposed high places or unprotected moving mechanical parts; he could understand, remember and carry out simple instructions; he could occasionally interact with coworkers, but could not perform group or tandem tasks; he could have no interaction with the public; he could use judgment to make simple, work-related decisions; he could deal with occasional changes in a routine work setting; and he could not perform work requiring a specific production rate such as assembly line work or work requiring hourly quotas. (R. at 39.)

The ALJ found Gilbert's headaches to be a severe impairment, but he found that they did not equal a listed impairment. Because there is no listing specifically for primary headache disorders, the ALJ is instructed to evaluate the severity and duration of a primary headache disorder under the Listing 11.02(B) criteria. *See* S.S.R. 19-4p, Titles II & XVI: Evaluating Cases Involving Primary Headache Disorders, 2019 WL 4169635, at *7 (Aug. 26, 2019). When evaluating Gilbert's migraines/headaches, the ALJ stated:

> As [Gilbert] has a primary headache disorder, I must consider the condition to the extent that it may equal[] another listed impairment (SSR 19-4p). While primary headache disorders are not listed impairments, the most closely analogous listing[,] epilepsy, [is] found at section 11.02 of the listings. Here, [Gilbert's] headache disorder does not equal the requirements of listing 11.02. While [Gilbert] has testified to rather frequent migraine-type headaches, alleging that they occur one-to-two times per week, the overall stability and conservative nature of the claimant's treatment record is inconsistent with such frequency (Exhibit 9F). I find that the record does not support a finding that his condition equals the requirements of Listing 11.02 or any other listed impairment.

(R. at 36.)

Because the ALJ found that Gilbert's headaches were a severe impairment, he included functional limitations to account for the occupational restrictions Gilbert required due to his headaches. Specifically, the ALJ wrote:

> [Gilbert's] records also note treatment for migraine headaches. He was provided with medication to address his headaches and had largely routine follow-up. In April 2023, he suggested that he was experiencing one-to-two migraines per week with associated loss of right eye vision. He suggested that medication was not helping at that time (Exhibit 9F/1). However, the overall stability of his treatment notes is inconsistent with the degree of alleged restriction. To the extent that migraine headaches occur on a regular basis, they contribute to the claimant's limitations working around hazards and necessitate a lower stress environment that requires dealing with only occasional changes in a routine work setting, making only simple work-related decisions, and not performing production rate pace work, as work beyond these limitations could result in stress contributing to a migraine.

(R. at 42.)

The residual functional capacity assessment represents the most Gilbert can do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2025). The ALJ assesses the residual functional capacity "based on all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). In other words, the residual functional capacity assessment is drawn from the complete record. The ALJ must consider the combined effect of all impairments, both severe and nonsevere, in assessing a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1523(c), 416.923(c) (2025). In this case, the ALJ properly considered and made accommodations for Gilbert's migraine/headache condition. First, the ALJ cited the medical records which contain Gilbert's complaints of migraines/headaches, noting that "[i]n April 2023, [Gilbert] suggested that he was experiencing one-to-two migraines per week with associated loss of right eye vision." (R. at 42.) The ALJ then formulated a residual functional capacity assessment that included several migraine related limitations:

> To the extent that migraine headaches occur on a regular basis, they contribute to the claimant's limitations working around hazards and necessitate a lower stress environment that requires dealing with only occasional changes in a routine work setting, making only simple work-related decisions, and not performing production rate pace work, as work beyond these limitations could result in stress contributing to a migraine.

(R. at 42.)

The ALJ further found that "the overall stability and conservative nature of the claimant's treatment record" did not warrant further restrictions. (R. at 36.) I find this to be supported by the record. For example, Gilbert went to the emergency department on October 28, 2021, complaining of a headache lasting two days, but he left the hospital before medications could be prescribed. (R. at 542, 546.) On

November 11, 2021, he told Dr. Javed he was having headaches, and he was prescribed Imitrex. (R. at 482-83.) During his psychological evaluation with Dr. Dar, he said he developed headaches when upset or nervous. (R. at 439.) On February 9, 2022, Gilbert completed a Disability Determination Services Headache/Migraine Questionnaire. (R. at 304.) Gilbert indicated he headaches/migraines at least four times a week; his headaches/migraines sometimes lasted all day; his symptoms included a dull ache and stabbing pain; his last headache/migraine was two days previously; he treated his headaches/migraines by lying in bed in a dark room with no noise; and it sometimes took him 24 hours to recover from a headache/migraine. (R. at 304.) During his May 21, 2022 consultative examination with Stevens, Gilbert indicated he had headaches. (R. at 446.) Gilbert endorsed headaches at a September 26, 2022 appointment with Anderson. (R. at 453.) In April 12, 2023, Gilbert complained of frequent and severe right-sided headaches with vision loss, eye twitches and agitation, and Dr. Blevins prescribed Imitrex, verapamil and indomethacin for cluster headaches. (R. at 523, 521.) During a neuropsychological assessment on November 2, 2023, Gilbert said he currently had a headache that was a five out of 10 in severity. (R. at 537.) However, at most of his medical appointments, Gilbert denied headaches. (R. 442, 478, 480, 497, 501, 503, 505, 509, 511, 517, 534.) While the record is clear that Gilbert suffers from headaches, the ALJ is correct that the record shows relatively infrequent complaints and conservative medical treatment for his headaches. *See Gross v. Heckler*, 785 F.2d 1161, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.") In accordance with the regulations, the ALJ considered the longitudinal record related to Gilbert's headaches. To the extent that those records presented conflicting evidence as to the functional limitations resulting from Gilbert's headaches, the ALJ resolved those conflicts by crafting a residual functional capacity that included limited work around hazards and a low-

stress environment. It is not within this court's purview to second-guess that decision. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]."); *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (unpublished) ("There were a number of conflicts in the evidence here, and we do not second guess the ALJ in resolving those conflicts.")

For the reasons stated herein, I find that substantial evidence exists to support the ALJ's consideration of Gilbert's functional limitations arising from his headache disorder and his finding that Gilbert had the residual functional capacity to perform a limited range of light work. For all these reasons, I further find that substantial evidence also supports the ALJ's finding that Gilbert was not disabled at any time from October 28, 2021, through April 1, 2024.

**PROPOSED FINDINGS OF FACT**

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding regarding Gilbert's headaches/migraines; and
2. Substantial evidence exists in the record to support the Commissioner's finding that Gilbert was not disabled under the Act and was not entitled to SSI or DIB benefits from October 28, 2021, through the date of his decision.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court affirm the Commissioner's decision denying benefits.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. §636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: August 27, 2026.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE